OPINION OF THE COURT
Carol R. Edmead, J.
In a special proceeding brought under Executive Law § 63 (12) and General Business Law article 22-A, petitioner, the People of New York, by Eric Schneiderman, Attorney General of the State of New York (the Attorney General or the State), alleges that respondents, who are involved in the business of selling magazine subscriptions and renewals, violated General Business Law §§ 349, 350, 335-a, as well as Executive Law § 63 (12) (motion seq. No. 001). Respondents cross-move to dismiss the petition.
The State’s petition seeks an order: (1) permanently enjoining respondents from soliciting business in violation of General Business Law §§ 349, 350 and 335-a, and Executive Law § 63 (12); (2) directing respondents to render an accounting to the Attorney General of the names and addresses of all consumers who paid fees to respondents for a new or renewal subscription to a magazine or other publication; (3) directing respondents to make full monetary restitution and pay damages to all aggrieved consumers, known and unknown; (4) directing respondents to disgorge all sums received from their fraudulent and illegal conduct; (5) directing respondents, pursuant to General Business Law article 22-A, to pay a civil penalty in the sum of *814 $5,000 to the State for each violation of General Business Law article 22-A; (6) directing respondents to pay a civil penalty to the State for known violations of General Business Law § 335-a; and (7) awarding the State costs plus an additional allowance of $2,000 against each respondent.
Background
The crux of the State’s claims is that respondents send misleading solicitations for magazine, newspaper and periodical subscriptions. The solicitations have an official appearance that the State argues creates a misleading impression that they are sent by the publications themselves. On the left side, they contain four boxes, containing numbers, labeled: “Control Number,” “Please Return By,” “Installment” and “Total Amount.” Near the four boxes, usually above and below, are two items written in bold: (1) a publication’s name and (2) a phrase suggestive of billing, such as “Magazine Payment Services,” “Publishers Billing Exchange,” “Publishers Billing Center,” “United Publishers Service,” “Magazine Billing Network,” “Publishers Billing Association,” “Subscription Billing Service,” “Publishers Billing Center,” or “Subscription Billing Service.” The right side of the solicitations typically contain the same four boxes labeled: “Control Number,” “Please Return By,” “Installment,” and “Total Amount,” this time under a heading of “Notice of Renewal,” and again with the publication’s name printed underneath the boxes.
The State argues that these solicitations create a misleading impression that they were sent by the publications themselves. Respondents, which typically do not have authorization to act as agent for the various publications, charge significantly more for the subscription than the publications themselves charge and retain the difference. The State also alleges that respondents, when soliciting for renewal subscriptions, have failed to disclose the date that existing subscriptions end, as required by New York law. Respondents argue that this law is unconstitutional.
More broadly, respondents argue that they had authority to sell the subscriptions in the sense that, typically, they are able to process the orders by serving as a middleman. Moreover, respondents contend that any confusion about whether the solicitation was made by the publication itself is the fault of consumers, as the back of the solicitations contains the following disclosure:
*815 “We offer over 600 magazines as an independent subscription agent between magazine publishers and clearinghouses in order to facilitate sales and service. As an agent we do not necessarily have a direct relationship with publishers or publications that we offer. With your purchase you authorize us and our suppliers to process and clear your order with the publishers directly or by whatever means available. This is a magazine subscription offer not a bill or invoice. You are under no obligation to either buy a magazine or renew at this time. However, your business is greatly appreciated. Renewals will start after your current subscription has expired. Please allow 6 to 12 weeks for processing. New subscribers please allow 6 to 12 weeks for delivery to start. If renewal, please refer to the magazine mailing label to find the subscription expiration date. All orders are fully cancelable by calling within 7 days after placing an order. After that, in most cases, cancellations will not be accepted. If a cancellation is accepted, it will be subject to a $20.00 cancellation fee. If you have any questions or would like to inquire about other magazines we offer, please call our customer service number on the front of this offer.”
Respondents also contend that the Attorney General is trying to protect the interests of publishers, who have complained about their practices, rather than consumers, who have also complained about their practices. Finally, respondents argue that the court does not have jurisdiction over the individual respondents and Adept Management, Inc. (Adept).
Discussion
I. Standard of Review
“[A] special proceeding is subject to the same standards and rules of decision as apply on a motion for summary judgment, requiring the court to decide the matter upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised” (Matter of Gonzalez v City of New York, 127 AD3d 632, 633 [1st Dept 2015] [internal quotation marks and citations omitted]). Thus, we have in effect a summary judgment motion and a motion to dismiss.
“Summary judgment must be granted if the proponent makes ‘a prima facie showing of entitlement to judgment as a matter *816 of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact,’ and the opponent fails to rebut that showing” (Brandy B. v Eden Cent. School Dist., 15 NY3d 297, 302 [2010], quoting Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). However, if the moving party fails to make a prima facie showing, the court must deny the motion, “ ‘regardless of the sufficiency of the opposing papers’ ” (Smalls v AJI Indus., Inc., 10 NY3d 733, 735 [2008], quoting Alvarez, 68 NY2d at 324).
“When determining a motion to dismiss,” on the other hand, “the court must accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory” (Goldman v Metropolitan Life Ins. Co., 5 NY3d 561, 570-571 [2005] [internal quotation marks and citations omitted]). “Dismissal under CPLR 3211 (a) (1) is warranted ‘only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a . matter of law’ ” (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002], quoting Leon v Martinez, 84 NY2d 83, 88 [1994]).
Executive Law § 63 (12)
Executive Law § 63 (12) enables the Attorney General to petition the court, on behalf of the people of New York, for redress against “any person” who has engaged in “repeated fraudulent or illegal acts.” While this statute “does not create independent claims” (People v Charles Schwab & Co., Inc., 109 AD3d 445, 449 [1st Dept 2013]), it does provide the Attorney General standing “to seek redress and additional remedies for recognized wrongs” (State of New York v Cortelle Corp., 38 NY2d 83, 85 [1975]).
Respondents are correct that while Executive Law § 63 (12) provides the standing for the Attorney General to bring this petition, it does not provide an independent cause of action on which the state can find redress. While the State argues at length that the holding in Charles Schwab was incorrect, it is worth remembering that this court does not review decisions of the Appellate Division; quite the opposite.
II. Jurisdictional Issues
Corporate respondents, except for Adept, do not contest jurisdiction. However, individual respondents Lydia Pugsley and Laura Lovrien each contend that New York has no jurisdic *817 tion over them. Adept also claims that it is not subject to New York jurisdiction because its business is limited to Oregon.
Adept
The State claims that Adept is subject to jurisdiction under CPLR 302 (a) (1) and (3).
Under CPLR 302 (a) (1), a court may exercise jurisdiction over a non-domiciliary who, in person, or through an agent, “transacts any business within the state or contracts anywhere to supply goods or services in the state.” CPLR 302 (a) (1) is a single transaction statute, meaning “proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant’s activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted” (Deutsche Bank Sec., Inc. v Montana Bd. of Invs., 1 NY3d 65, 71 [2006]).
Purposeful activities in this context are “volitional acts” with which a defendant “avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws” (McKee Elec. Co. v Rauland-Borg Corp., 20 NY2d 377, 382 [1967] [internal quotation marks and citation omitted]). While not all purposeful activity constitutes a transaction of business, and it is impossible to precisely fix those acts which do so, the Court of Appeals has held that “it is the quality of the defendants’ New York contacts that is the primary consideration” (Fischbarg v Doucet, 9 NY3d 375, 380 [2007] [finding purposeful activity constituting a transaction of business where defendants attempted to establish an attorney-client relationship in New York, directly participated in that relationship through calls, faxes and emails and projected themselves into the state over an extended period]).
The State argues that Adept’s exclusive business is providing support to the other corporate respondents in this litigation—in the form of bookkeeping, data management, consumer mail processing, and consumer refund processing (petition ¶ 11). Pugsley, the owner of Adept (Pugsley aff ¶ 2), confirms that Adept is “a consulting firm that provides clients in Oregon with data reporting, data management and bookkeeping services” (id. ¶ 7) and that Adept’s clients included respondents Associated Publishers Network, Inc. (APN), Orbital Publishing Group, Inc. (Orbital), Liberty Publishers Service, Inc. (Liberty), Express Publishers Service, Inc. (Express), and Henry Cricket Group, LLC (Henry Cricket Group) (id. ¶ 8).
*818 In addition to Adept’s data management and bookkeeping role, the State alleges that Adept, through Pugsley, reviews the solicitations. The State argues that Adept would not have any business at all if it did not support companies like APN, that send solicitations to consumers in New York.
In her affidavit, Pugsley specifies Adept’s role in rendering data management services to the other corporate respondents:
“In connection with data management services Adept rendered to its clients, Adept received mailing list data from a third-party provider on behalf of the clients .... I submitted the mailing lists to the clients’ commercial mail house, World Marketing. World Marketing prints the mail pieces, stuffs the envelopes, arranges for the application of the required postage pieces . . . and delivers the mail to the Postage Service . . .
“[0]nce orders are processed ... I upload the data to forward the subscription orders to the clients’ clearing firms” (Pugsley aff ¶¶ 13, 16).
As for the bookkeeping services, Pugsley states that
“I upload refund files that Adept receives from the clients and print checks to effectuate customer refunds. Adept’s magazine subscription agent clients utilize a customer service company called Publisher Payment Processing, Inc. (PPP) . . .
“It is my understanding that PPP handles all incoming telephone customer service for the magazine subscription clients. If a customer makes a request for a refund by calling the customer service call center maintained by PPP, PPP tracks those refund requests and forwards them to the clients to be processed and refunded. As part of the services Adept renders to its clients, I assist them in effectuating these refunds” {id. ¶¶ 18-19).
Pugsley adds that it is not “within the realm of my services to deal with customer complaints. I do not deal with customer complaints on behalf of my clients, nor do I provide advice on how to handle these complaints” {id. ¶ 20). Pugsley adds that, in connection to Adept’s data management and bookkeeping services, “I keep track of the number of mailers and envelopes in inventory maintained at the mail house for the benefit of independent subscription agents” {id. ¶ 21).
As to the allegation that Adept has control over the content of the solicitations, Pugsley states:
*819 “Neither I nor Adept is in the business of soliciting magazine subscription offers. I do not have authority or right of authorship with regard to the content of the mail solicitations sent out by my clients . . .
“I am aware of two changes that I was involved with regarding Adept’s client’s direct mail solicitations.
“Because Adept submitted the mail lists to World Marketing on behalf of the mail agents, in or about 2012, I was . . . advised that the United States Postal Service conducted an independent review .... [T]he United States Postal Service requested that the words ‘renewal offer’ be placed on the bottom of the solicitation to comport with standard mail requirement. Pursuant to that notification I acted as intermediary between the client and the mail house to facilitate that change” (id. ¶¶ 25, 27-28).
The other example of Pugsley and Adept being involved with the content of the solicitations regarded a response to an investigation by the Oregon Attorney General. In response to that investigation, in February 2014, Pugsley suggested that the “mail agent clients” remove language from the solicitations that included the statement, “you are receiving one of the lowest available rates we can offer for your regular subscriptions,” and replacing it with “[y]our subscription to [magazine] is remitted upon receipt of your full payment when you choose to renew or order a new subscription” (id. ¶¶ 30-31). Pugsley also states that “I may have made other suggestions to clarify language, however any suggestion made by me is simply that—a suggestion—and the clients are under no obligation to take my advice” (id. ¶ 32).
This is a close question under CPLR 302 (a) (1). From a technical view, Adept has been careful not to project itself into New York or to transact business here. From a practical view, it is hard to deny that Adept, albeit indirectly, has availed itself of the benefit of New York consumers, as the record shows that Adept’s reason for being is to support and facilitate the solicitations that are the subject of this proceeding. The record also shows that all of Adept’s profits flow from these same solicitations.
It is clear that “[t]he lack of an in-state physical presence is not dispositive” and that a non-domiciliary can bring itself within the scope of CPLR 302 (a) (1) by “using electronic and *820 telephonic means to project themselves into New York to conduct business transactions” (Paterno v Laser Spine Inst., 24 NY3d 370, 376 [2014] [internal quotation marks and citations omitted]). It is less clear, and an unresolved question in New York, whether a non-domiciliary is subject to jurisdiction under CPLR 302 (a) (1) where it relies on contacts with New York that are indirect in two ways: they are sent through the mail and they are sent by sister entities that, together with the non-domiciliary, form a single business model.
Several features of Adept’s business model, however, cut strongly in favor of jurisdiction. Respondents APN, Liberty, Orbital, and Express are all owned by Henry Cricket Group, a New York limited liability company. Since these are Adept’s clients, and provide Adept’s revenue, Adept has availed itself of the laws of New York, under which Henry Cricket Group is organized. Moreover, Pugsley’s affidavit shows that Adept not only processes the mailing addresses, payments, and refunds of New York consumers, but also has a role in formulating the content of the solicitations sent to New York consumers. In these circumstances, jurisdiction is appropriate under CPLR 302 (a) (1).
CPLR 302 (a) (3) provides long-arm jurisdiction over a non-domiciliary who “commits a tortious act” outside the state that causes “injury to person or property within the state.” Under this provision, the party seeking to invoke New York’s jurisdiction must show not only injury within the state but also that either the first or second subparagraph of CPLR 302 (a) (3) has been satisfied (Ingraham v Carroll, 90 NY2d 592, 596 [1997]). CPLR 302 (a) (3) (i) requires that the tortfeasor “regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state,” while CPLR 302 (a) (3) (ii) requires that the tortfeasor “derives substantial revenue from interstate or international commerce” and that she “expects or should reasonably expect the act to have consequences in the state.”
Here, the State alleges that Adept committed the tortious act of reviewing and processing solicitations that violate New York law. Moreover, it is clear that Adept derives substantial revenue from interstate commerce and that Adept should have anticipated that the solicitations would have consequences within New York. Thus, long-arm jurisdiction over Adept is appropriate under CPLR 302 (a) (3) (ii).
*821 Jurisdiction is also appropriate under due process analysis. The US Constitution is not satisfied in this context unless a non-domiciliary has “minimum contacts” with the forum state (see International Shoe Co. v Washington, 326 US 310, 316 [1945]). The test for minimum contacts rests on whether the defendant’s “conduct and connection with the forum State” are such that the defendant “should reasonably anticipate being haled into court there” (World-Wide Volkswagen Corp. v Woodson, 444 US 286, 297 [1980]). A defendant can reasonably expect such when it “purposefully avails itself of the privilege of conducting activities within the forum State” (id. [internal quotation marks and citation omitted]). If minimum contacts are found, the court must determine if the prospect of defending the suit in the forum state comports with traditional notions of “fair play and substantial justice” (Burger King Corp. v Rudzewicz, 471 US 462, 476 [1985], quoting International Shoe Co., 326 US at 320).
Here, Adept has minimum contacts with New York (1) because it facilitates the solicitations of New York residents by processing their mailing addresses, payments, and refunds, and by having a role in determining the content of solicitations sent to New York residents; and (2) because it receives its revenue from a company organized under New York law. It comports with notions of fair play and substantial justice to bring Adept before a New York court because it derives its revenue from facilitating the solicitations of hundreds of thousands of New York residents. In this circumstance, Adept can reasonably expect to be brought before a New York court if those solicitations violate New York law.
Pugsley
Respondents argue that all of Pugsley’s contacts with New York were conducted in her corporate capacity and do not confer jurisdiction over her as an individual. Additionally, respondents argue that Pugsley owns no property in New York and she has never been in it.
However, New York has rejected the “fiduciary shield doctrine” (Kreutter v McFadden Oil Corp., 71 NY2d 460, 468-471 [1988]; see also People v Allied Mktg. Group, 213 AD2d 256 [1st Dept 1995]). Thus, Pugsley may not avoid jurisdiction because she was working as an officer of Adept while accruing contacts with New York. This is especially true since Pugsley enjoyed almost total control over Adept as its owner, president and principal laborer (see Kreutter at 467). Since Pugsley *822 herself conducted all of the activity ascribed to Adept in the petition, and as any benefit that accrued to Adept also accrued to Pugsley, she is subject to jurisdiction in New York for the same reasons that Adept is.
Lovrien
Lovrien argues that she was not properly served with the petition. Christopher Zornes, the deputy sheriff who served the petition to her attorney, stated that, prior to April 2015, he had served notice of other litigation to Lovrien at her house. “Ms. Lovrien and her husband met me at the gates of their residence to accept papers. At that time, Ms. Lovrien’s husband informed me that any future service of legal process should be delivered to Ms. Lovrien’s attorney, David Lennon (Lennon)” (Zornes aff ¶ 3). On April 1, 2015, Zornes, along with a colleague, served Lennon at 335 Industrial Circle, White City, Oregon, the building from which various respondents also operate {id. ¶ 4). Zornes states that when he delivered the pleadings, “Lennon told me that he was authorized to accept service on behalf of all the Respondents, including Laura Lovrien” {id. ¶ 5).
Lennon provides his own affidavit, in reply, in which he states that while he agreed to “take multiple copies of the papers for certain of the Respondents,” he did not “advise them that I was authorized to accept service of process” (Lennon affirmation ¶¶ 2-3).
Here, while the State attempted to make service to a designated agent pursuant to CPLR 308 (3), that designation was never made in writing as required by CPLR 318. Thus, the State failed to properly serve her. Accordingly, the portion of respondents’ cross motion that seeks to dismiss the petition as against Lovrien is granted (see Williams v DRBX Holdings, LLC, 80 AD3d 534, 534 [1st Dept 2011] [“(n)otice received by means other than those authorized by statute does not bring a defendant within the jurisdiction of the court” (internal quotation marks and citation omitted)]).
III. General Business Law § 335-a
General Business Law § 335-a (4) provides, in relevant part, that
“[a]ny person, firm, association or corporation engaged in business, the principal purpose of which is to regularly solicit magazine subscription orders for delivery in this state through the mail for profit shall, in any direct written communication to a magazine subscriber inviting the subscriber to *823 renew a subscription, clearly, conspicuously, understandably and readably:
“a. disclose the month and year in which the subscription expires.”
This statute provides that, following an application by the Attorney General, courts can issue an injunction to “restrain the continuance of such violations” (General Business Law § 335-a [5]). Under the statute, courts can also impose a civil penalty of up to $100 for a single violation and up to $500 for multiple violations (id.). Finally, the statute provides that there is no violation if the alleged violator “shows, by a preponderance of the evidence, that the violation was not intentional and resulted from a bona fide error made notwithstanding the maintenance of procedures reasonably adopted to avoid such error” (id.).
Here, respondents make a substantive due process challenge to General Business Law § 335-a. In evaluating such a challenge, courts ask if there is a rational connection between the regulation and a legitimate state interest (see Montgomery v Daniels, 38 NY2d 41, 54 [1975]). In doing so, “courts are not to consider the wisdom or efficacy of that law or whether it is superior to other alternatives” (Barklee Realty Co. v Pataki, 309 AD2d 310, 318 [1st Dept 2003]). Instead, “it is for the Legislature alone to determine the advantages and drawbacks of the legislation in achieving a legitimate purpose” (id.). As the Court of Appeals has recently noted, “[e]conomic regulation will violate an individual’s substantive due process property interest only in those situations, vanishingly rare in modern jurisprudence, where there is absolutely no reasonable relationship to be perceived between the regulation and the achievement of a legitimate governmental purpose” (Brightonian Nursing Home v Daines, 21 NY3d 570, 575-576 [2013]).
Respondents argue that the regulation was initially constitutional, as it applied only to publishers, but was rendered unconstitutional by an amendment which made it applicable to “independent subscription agents.” As such agents typically have no relationship with the publishers, they typically have no way of knowing when various subscriptions expire or even if the consumers who receive their solicitations have subscriptions at all. Thus, compliance with this provision, respondents argue, would effectively preclude them from conducting their business in New York.
Respondents concede that protecting the public is a legitimate interest, but argue that the legislation, as it applies to *824 them, is not rationally calculated to achieve this goal. First, they contend that if only publishers printed the expiration date clearly on all publications sent to subscribers, then consumers could just cross reference those publications when they receive solicitations from respondents. Second, respondents argue that nonprofits are irrationally excluded from the regulation.
Here, the legislature’s legitimate purpose in passing General Business Law § 335-a is consumer protection. This legislation was sought by the New York Consumer Protection Board, which was responding to complaints from consumers about misleading solicitations. This interest is rationally related to the regulation, which applies to for-profit entities engaged in soliciting magazine subscriptions. The fact that the legislature chose to balance this interest with the interest of promoting nonprofit enterprises, by excluding them from the obligation, does not provide an opportunity for the court to re-legislate the issue. Similarly, the fact that this regulation may preclude respondents from sending solicitations to New York does not render it unconstitutional. The legislature has made an implicit judgment that if a subscription agent does not know when a consumer’s current subscription ends, it cannot solicit that consumer for a renewal. Making that judgment is within the legislature’s authority. Accordingly, General Business Law § 335-a does not violate substantive due process.
Respondents also argue that they did not know about this regulation since New York is the only state that has it. In these circumstances, the proper remedy is an injunction against respondents to preclude them from sending solicitations to New York for the renewals of publications without complying with General Business Law § 335-a. Respondents can make no argument that, at this point, it does not know that New York law precludes them from sending solicitations for renewals without including the date when the current subscription ends.
IV. General Business Law §§ 349 and 350
General Business Law § 349 provides standing to the Attorney General and injured parties to bring an action against parties who have engaged in “[deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state” (General Business Law § 349 [a]). As for remedies, the statute provides courts with authority to grant injunctive relief and to “obtain restitution of any moneys or property obtained directly or indirectly” by such deceptive acts (General Business Law § 349 [b]). Finally, the *825 statute grants courts discretion to “increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section,” adding that courts “may award reasonable attorney’s fees to a prevailing plaintiff” (General Business Law § 349 [h]).
General Business Law § 350 is a companion to General Business Law § 349. It provides that false advertising, “in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.” The Court of Appeals has held that the broad scope of General Business Law §§ 349 and 350 provides courts with the “authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State” (Karlin v IVF Am., 93 NY2d 282, 291 [1999] [internal quotation marks and citation omitted]).
In order to make a prima facie case under General Business Law § 349, the State must show that the respondents have engaged in a “deceptive act or practice that is consumer oriented” (Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330, 344 [1999] [internal quotation marks and citation omitted] [holding that dismissal was inappropriate as the plaintiffs had raised a question of fact as to whether reasonable consumers would have been misled in a material way]). The Court of Appeals has defined “a deceptive act or practice as a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances” (id. [internal quotation marks and citation omitted]). “A similar showing is required under General Business Law § 350” (St. Patrick’s Home for Aged & Infirm v Laticrete Intl., 264 AD2d 652, 655 [1st Dept 1999]).
Here, the State makes a prima facie showing through its submission of the solicitations, which are clearly consumer directed, and which, at least, raise a question of fact as to whether reasonable consumers would be materially misled. That is, the solicitations themselves seem to create the impression that they are being sent directly from publishers, when, of course, they are not. This implication could cause consumers to believe that they are being offered the subscriptions at a standard price, when they are, in fact, being offered a subscription in which they pay a significant premium—sometimes as much as nearly twice the publisher’s rate—for the subscription. Thus, respondents are not entitled to dismissal of the State’s claims under General Business Law §§ 349 and 350.
*826 The State, however, is not, at this stage, entitled to judgment on their petition with respect to these claims. The disclaimer on the back of the solicitations raises a question of fact as to whether a reasonable consumer would have taken the time to read it and learn that the solicitations were not being sent by publishers and that the cancellation policy may be more draconian than the ones offered by publishers. While the State offers several federal cases that stand for the proposition that a disclaimer does not necessarily inoculate a party from liability for deceptive advertising under the Federal Trade Commission Act (see e.g. Federal Trade Commn. v Direct Mktg. Concepts, Inc., 624 F3d 1, 12 [1st Cir 2010]), it is correct only to the extent that the disclaimer does not justify dismissal. It is, though, part of the totality of the solicitation that the fact-finder must take into account when determining if a reasonable consumer would find the solicitations materially misleading. As there is a question of fact as to whether respondents’ solicitations amounted to deceptive acts, the question of liability under General Business Law §§ 349 and 350 must be determined at a hearing before a factfinder.
Moreover, it is clear that, before a hearing, the State is entitled to an accounting of the names and addresses of all New York consumers who paid fees to respondents within three years prior to the filing of this petition. In the event that the factfinder finds that respondents have violated General Business Law §§ 349 and 350, the court will need this information in order to fashion an appropriate remedy under the statute. The three-year period corresponds to the three-year statute of limitations period for claims under General Business Law §§ 349 and 350 (CPLR 214 [2]; see also Wender v Gilberg Agency, 276 AD2d 311, 312 [1st Dept 2000]).
Conclusion
Accordingly, it is ordered that respondents’ motion to dismiss is granted only to the extent that (1) the petition is dismissed as against respondent Laura Lovrien; and (2) the substantive claim under Executive Law § 63 (12) is dismissed; and it is further ordered that the Attorney General’s petition, at this time, is granted only to the extent that (1) respondents are directed to provide the Attorney General with an accounting of the names and addresses of all New York consumers who, in the three years prior to the filing of the petition, paid fees to respondents; and (2) the State is also entitled to a judgment *827 that respondents’ solicitations violate General Business Law § 335-a, and that, as a result, respondents, and their agents, servants, employees and all other persons acting under the supervision or direction of respondents, are permanently enjoined and restrained from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: violating New York General Business Law § 335-a by sending magazine renewal subscriptions into New York without disclosing the month and year in which the subscription expires.